Joseph Kuljis and Georgia Kuljis v. Commissioner.
Kuljis v. Commissioner
Docket No. 79614.
United States Tax Court
T.C. Memo 1961-191; 1961 Tax Ct. Memo LEXIS 159; 20 T.C.M. (CCH) 953; T.C.M. (RIA) 61191; June 28, 1961
*159 Held: That payments totaling $19,000 made by petitioner Joseph Kuljis in 1956 as guarantor and endorser of commercial paper of an auto company, which became insolvent in 1956 and in which he and members of his family owned a controlling interest, resulted in a nonbusiness bad debt. Albert Sidney Johnston, Jr., Esq., Schwan Bldg., Biloxi, Miss., for the petitioners. D. Louis Bergeron, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined a deficiency in individual income taxes of petitioners for the year 1956 in the amount of $6,100.99. The only issue presented for our consideration is whether payments totaling $19,000 made by petitioner *160 Joseph Kuljis in 1956 as guarantor and endorser of commercial paper of an auto company, which became insolvent in 1956 and in which he and members of his family owned a controlling interest, resulted in a business or nonbusiness bad debt. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. Joseph Kuljis and Georgia Kuljis, husband and wife, reside at 950 West Beach, Biloxi, Harrison County, within the collection district of Mississippi, with headquarters at Jackson, Mississippi, where all returns hereinafter referred to were filed with the district director of internal revenue. Joseph Kuljis will hereinafter be referred to as petitioner. He was and still is a medical doctor who, except for the period of time he was in the Armed Forces of the United States, has for over fifteen years practiced medicine in and around Biloxi, Mississippi. His wife, Georgia Kuljis, the other petitioner, is and, at all times material, was a housewife. Since the dissolution early in 1950 of a partnership of which he and another were equal partners in the ownership and operation of two drugstores, petitioner and his wife have been operating one *161 drugstore known as Avenue Pharmacy, which he received in the liquidation of the former partnership. Said building from which the petitioners report rental income each year also contains petitioner's medical office and clinic. On or about February 1, 1953, W. C. McElroy and Russ Murfee organized a partnership known as McElroy Nash to deal in new and used automobiles. Each partner contributed $5,000, or a total of $10,000, as the opening capital of the business. The business continued in operation until on or about October 31, 1953, when it liquidated its assets subject to liabilities to W. C. McElroy who, in turn, transferred said assets to a new corporation organized under the laws of the State of Mississippi on or about October 30, 1953. Said new corporation known as McElroy Nash Co., Inc., hereinafter referred to as the auto company, was organized with an authorized capitalization of $40,000, represented by 400 shares of common stock of the par value of $100 per share. Said stock was issued to W. C. McElroy in exchange for the net assets and to petitioner for cash as follows: Shares Ac-
Total Book
quired
Value
Stockholder
250
$25,000
W. C. McElroy
150
15,000
Joseph Kuljis
400
$40,000
*162 Shortly thereafter, petitioner acquired from W. C. McElroy for cash 50 shares for $5,000, thus equalizing their holdings at 200 shares costing or valued at $20,000. By amendment of the charter on or about November 30, 1954, the capitalization of the corporation was increased from $40,000 to $90,000 and the number of shares from 400 to 900 shares. Such additional shareholdings were as follows: Shares Ac-
Date
quired
Cost
Stockholder
11- 1-54
100
$10,000
Parker
25
2,500
Alex Kuljis
25
2,500
Georgia Kuljis
50
5,000
Steve Kuljis
50
5,000
Peter Kuljis
50
5,000
W. C. McElroy
50
5,000
Joseph Kuljis
1-31-55
50
$ 5,000
Joseph Kuljis
50
5,000
Bob Mohler
40
4,000
10
1,000
Total
500
$50,000 Alex, Steve and Peter Kuljis were brothers of the petitioner. The cost to petitioner of his common stock was as follows: Date Ac-
quired
Shares
Cost
11- 1-53
15
$15,000
11- 1-53
5
5,000
11- 1-54
5
5,000
1-31-55
5
5,000
Total
30
$30,000
Petitioner on August 19, 1955, loaned the auto company $5,000. The auto company became highly involved and insolvent in January 1956 at which time it *163 was left without assets by the creditors while McElroy, now recently deceased, who had been its general manager at an annual salary of $6,000, as well as secretary-treasurer, disappeared. Petitioner throughout its existence was its president. During the period of its existence, the auto company borrowed various sums of money from the First National Bank of Biloxi, Biloxi, Mississippi, and was indebted to Commercial Credit Corporation, Gulfport, Mississippi. At the time the auto company became hopelessly insolvent, it was indebted to the bank on petitioner's and McElroy's endorsement. On June 29, 1956, petitioners, through the attorneys, reached an amicable settlement with the bank. The indebtedness was reduced by a payment of $6,709.74 and on June 29, 1956, petitioners executed their interest bearing note in the amount of $19,956.56. To guarantee their indebtedness as endorsers of the notes at the bank, petitioners on that date also executed a deed of trust. Payments on said note were made as follows: 1-2-57
$10,000.00
1-6-58
9,956.56
$19,956.56 The deed of trust, previously referred to above, was cancelled on January 6, 1958. When the auto company became *164 insolvent in January 1956, it was also indebted to Commercial Credit Corporation, Gulfport, Mississippi, in excess of $20,000. On or about April 17, 1956, petitioner made a settlement with the credit corporation, resulting in the payment to it of $19,000 as follows: 4-18-56
$ 5,000
5- 1-56
14,000
Total
$19,000
Legal fees were incurred in the settlement of the credit corporation bank liabilities in the amount of $750 as disclosed by the 1956 return. Petitioner, a medical doctor, developed symptoms in 1949 and had himself examined by a well known surgeon who made a preliminary diagnosis of Burgher's disease, a serious vascular disease which might develop to the point where amputation of both extremities might become necessary. Petitioner was advised to stop his surgical and obstetrical practice and take it easy. He had been a medical doctor since 1934 and had practiced in Biloxi, Mississippi, since 1939. For five years he was an intern, a resident and an industrial surgeon. From 1940 to 1942 he was in the Armed Forces of the United States. Petitioner curtailed his medical practice by cutting down his surgical work and arranging with another doctor to handle *165 obstetrical work. He also curtailed house visits. He did, however, continue to practice medicine and his income tax returns disclose gross receipts from such practice ranging from $25,000 to $33,000 for the respective years 1953 to 1958, inclusive. After the diagnosis of his condition and follow-up examinations during the years 1949 to 1951, inclusive, he decided that he had better start getting into some kind of business as security to take care of his wife and himself in the event he became incapacitated. Petitioner decided to build boats. He bought a diesel motor and one of his brothers did likewise. Nothing developed from this proposed activity. Later, his brothers asked him about financing the purchase of a tank truck for gasoline, which petitioner expressed his willingness to do. Again, however, nothing developed. Petitioner also contemplated going into the raw shrimp, oyster, and fish business with his brothers, petitioner to finance the business. Again, nothing tangible happened. Petitioner's auditor introduced him to W. C. McElroy who, together with Russ Murfee, owned a Nash automobile agency. Petitioner loaned McElroy $5,000 to buy out Murfee, in connection with *166 which a contract was drawn and signed and petitioner was given a note for $5,000. Thereupon, McElroy Nash, Inc., was chartered and organized with an original capitalization of $40,000, later increased to $90,000. Petitioner, his wife and members of his family owned a controlling interest in said corporation. Petitioner signed a guaranty of indebtedness agreement of obligations of McElroy Nash, Inc., to Commercial Credit Corporation and endorsed and agreed to pay certain promissory notes to the First National Bank of Biloxi, and to the Peoples Bank of Biloxi, Mississippi. McElroy Nash, Inc., did not prosper, became involved, and finally insolvent, and petitioner compromised and settled his obligations as guarantor to the Commercial Credit Corporation by payment to said corporation the sum of $19,000 as follows: $5,000 on April 18, 1956, and $14,000 on May 1, 1956. Later on, petitioner was called upon to pay, and paid, $10,000 to the First National Bank of Biloxi, on January 2, 1957, and $9,956.56 to said bank on January 6, 1958, plus interest and attorney's fees. Any right of subrogation was worthless to petitioner in 1956. Respondent determined that the $19,000 in question resulted *167 from a nonbusiness bad debt constituting a short-term capital loss. Opinion The issue before us resolves itself into the question of whether or not petitioner's payment in 1956 to Commercial Credit Corporation in settlement of his liability as guarantor resulted in a nonbusiness bad debt within the meaning of section 166(d)(2) of the Code of 1954. [1] There is no doubt that any right of subrogation was worthless in the year in question. The language of the statute further narrows the issue to a determination of whether the debt was created or acquired in connection with a trade or business of the taxpayer, or was a debt the loss from the worthlessness of which was incurred in such a trade or business. In any event, petitioner's contention must fail if he was not engaged *168 in a trade or business in connection with which the debt was created, acquired or incurred. The issue is essentially one of fact to be considered in the light of the circumstances of the particular case. There is no doubt that petitioner had the right to engage in a business or businesses in addition to his practice of medicine. We believe that he had a general intention to engage in some business in the nature of promotional and financial enterprises. Such an intention is not of itself sufficient to comply with the law, however. More significantly, the fact that he engaged in more than one business does not mean that a bad debt not connected with any one of his businesses requires treatment as a business bad debt where it would otherwise be deemed a nonbusiness bad debt. , affd. (C.A. 2, 1957), certiorari denied . Leaving for later discussion the circumstances directly relating to the bad debt claim in issue, we note that petitioner points to the fact that, in addition to practicing medicine, he operated a drugstore, received rent from a building, bought a *169 diesel motor with the intent to build boats, intended to go into the shipbuilding business, intended to finance a shrimp, fish and oyster business, loaned $5,000 to McElroy in 1953 to enable him to buy out Murfee's interest and loaned $5,000 to the auto company in 1955. He urges these facts in support of the proposition that he was engaged in the business of promotion and finance. The intentions above listed, however, did not materialize. No doubt the operation of a drugstore and the renting of property constituted the carrying on of one or more businesses, but had no relationship to the auto company or petitioner's guarantee of paper of the auto agency handled through Commercial Credit Corporation. The loan to McElroy in 1953 and to the auto company in 1955, whether considered separately or together, fall far short of demonstrating that petitioner was carrying on the business of lending money. See The acquisition by petitioner of stock of the auto company was obviously an investment. See . There is no evidence that petitioner was in the business of making investments, and no issue is presented *170 in relation to the treatment of such investment for tax purposes. The fact of such investment is noted because of its relationship to the claimed bad debt deduction. Coming to the bad debt issue itself, petitioner guaranteed paper of the auto company financed by Commercial Credit Corporation. The $19,000 paid to the credit corporation was in settlement of petitioner's liability as guarantor. He was, of course, entitled to subrogation, but this right was worthless. There is no evidence in the record establishing that petitioner was in the business of guaranteeing paper and no suggestion that petitioner was to be compensated for acting as guarantor. It is apparent that the guarantee was an accommodation liability assumed because of petitioner's interest in the auto company. See . Under the circumstances of the instant case, it is clear that the principles announced in , are controlling and that the item of $19,000 in issue represented a nonbusiness bad debt. Decision will be entered under Rule 50. Footnotes
1. SEC. 166. BAD DEBTS. * * *
(d) Nonbusiness Debts. - * * *
(2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩